[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The above-noted two foreclosure actions having been consolidated for trial came on for trial to the court commencing on June 1, 1994, and continuing on June 8, June 14, June 15 and June 22, to a conclusion.
As to Docket No. 52 92 44
This foreclosure action first came to this court by complaint dated October 8, 1991, and returnable November 26, 1991, seeking to foreclose a mortgage in the principal amount of $400,000 and a mortgage in the amount of $150,000 on land situated in the Town of East Lyme. Paragraphs 1 and 2 of the complaint involved the $400,000 mortgage and paragraphs 3 and 4 involved the $150,000 mortgage.
The complaint recites the granting of the $400,000 mortgage from Meadow Lakes Realty Co. a/k/a to New England Savings Bank dated March 31, 1988, with certain guarantors thereon.
The complaint recites the granting of the $150,000 mortgage from Meadow Lakes Realty a/k/a to New England Savings Bank dated January 6, 1989, with certain guarantors thereon. CT Page 9418
The complaint recites a tax lien to the Town of East Lyme.
The complaint recites a certain mechanic's lien claimed by Angus McDonald, Gary Sharpe and Associates, Inc.
The complaint seeks a foreclosure and other relief.
On November 21, 1991, counsel appeared for the defendant Locarno. On November 27, 1991, counsel appeared for the defendants Brodeur and Soucie.
On December 6, 1991, a default for failure to appear was granted as to the defendants Meadow Lakes Realty Co., Marlowe and Snow. On December 6, 1991, counsel appeared for the defendant McDonald and for the defendant McDonald-Sharpe and Associates, Inc.
On January 27, 1992, a default for failure to disclose a defense was entered as to the defendants Brodeur and Soucie. On January 23, 1992, an answer to the complaint was filed by the defendant McDonald-Sharpe and Associates, Inc.
On March 12, 1992, the defendant McDonald-Sharpe and Associates, Inc. moved for a determination of the priorities between the plaintiff and said defendant.
On December 13, 1993, the court, Leuba, J., granted the defendant McDonald-Sharpe and Associates, Inc. motion to consolidate this foreclosure action, Docket No. 529244, with the mechanic's lien foreclosure action Docket No. 520501.
On August 21, 1992, the defendant Marlowe appeared.
On November 9, 1992, the plaintiff bank withdrew paragraphs 3 and 4 of its complaint dated November 8, 1991, which paragraphs involved the $150,000 mortgage.
On January 28, 1993, the defendant Snow appeared. On March 8, 1993, the court O'Connell, J. granted a default for failure to disclose a defense as to the defendant Snow.
On October 18, 1993, the court Parker, J. granted the plaintiff's motion to substitute plaintiff indicating that New England Savings Bank through the Comptroller of the Currency had CT Page 9419 transferred and set over to Ali, Inc. the subject mortgage deed and note for $400,000.
On June 22, 1994, the plaintiff Ali, Inc. with leave of the court filed an amended complaint dated June 15, 1994.
As to Docket No. 52 05 01
This foreclosure action first came to this court by complaint dated October 9, 1991, and returnable October 29, 1991, seeking to foreclose a mechanic's lien which claimed the sum of $125,554.36 on lands situated in the Town of East Lyme.
The complaint recites an agreement between the plaintiff McDonald-Sharp and the defendant Meadow Lakes Realty Co., the furnishing of materials and engineering services, the performance of the work, the filing of the lien and service on the proper parties.
The complaint notes the New England Savings Bank mortgages and the Town of East Lyme's tax lien.
The plaintiff claims a foreclosure and other relief.
The lien describes two separate parcels of real estate.
On December 13, 1991, a default for failure to appear was granted against the defendant Glen Lakes Realty Co. f/k/a Meadow Lakes Realty Co.
On December 30, 1991, the defendant New England Savings Bank appeared.
On May 21, 1992, the defendant New England Savings Bank filed an answer to the complaint and six special defenses.
On June 17, 1992, the plaintiff filed a reply to the special defenses and the pleadings were closed.
The court makes the following findings of fact.
Gary Sharpe is vice president and a stockholder in Angus McDonald-Gary Sharpe Associates, Inc. CT Page 9420
The firm, McDonald-Sharpe, does site planning and designs commercial projects. The firm has been in business about 30 years and Sharpe has been with the firm 25 years. The firm is involved in conceptual planning.
The firm has about 30 employees. Since October of 1986, the firm has been on a computer billing basis. While Sharpe was familiar with the East Lyme project, Project #2277, he was not directly involved and did not work on the same.
Angus McDonald is president of McDonald-Sharpe Associates, Inc., with offices located at 233 Boston Post Road, Old Saybrook, Connecticut, and the principal stockholder of said firm.
Angus McDonald is a partner in the partnership known as Glen Lakes Realty Co. a/k/a Meadow Lakes Realty Co.
McDonald-Sharpe was initially requested by Glen Lakes to do a study of feasibility of developing a certain tract of land situated in East Lyme for residential construction. There was no written contract between McDonald-Sharpe and Glen Lakes. The partnership of which McDonald was one held monthly meetings. The managing partners of the partnership Glen Lakes a/k/a were Brodeur and Locarno.
McDonald and Sharpe each recorded their time spent on various jobs in daily diaries made up in accordance with firm policy.
The feasibility study undertaken by McDonald-Sharpe was to determine the suitability or lack thereof of the East Lyme premises for a residential subdivision.
Latimer Brook runs through a portion of the subject premises and affects access thereto.
The subject premises before acquisition by Glen Lakes a/k/a had in part been operated as a gravel site. The feasibility study results showed the necessity for bridging certain wetlands on the subject premises in order to have proper means of access.
A master plan was developed calling for 125 lots, roads, drainage and site testings. CT Page 9421
The master plan involved two separate parcels and the resolution of certain boundary problems with an abutting owner named Kowalski. The following agencies or departments were involved in the formulation of the master plan:
 East Lyme Wetlands Agency Department of Environmental Protection East Lyme Planning and Zoning State Highway Department U.S. Corps of Engineers
There were design problems due to the prior use of a portion of the properties for gravel and top soil removal.
The subject premises (two parcels taken together) contained three or four ponds. Problems developed relative to access from Chesterfield Road, East Lyme, due to the presence of Latimer Brook and wetlands which required consideration of a means of access or egress over the so-called Kowalski parcel. Special design considerations were encountered due to bridging requirements.
All bills and statements rendered by McDonald-Sharpe during the first two years of their being involved in the site development were paid in full.
At the time of the initial request by Glen Lakes a/k/a to McDonald-Sharpe for the feasibility study the partnership did not hold title to any of the subject premises. The project, should the same be feasible, envisioned 125 to 130 lots.
After the feasibility study, topographic studies indicated two means of access to the premises were required.
In earlier years under ownership of Locarno and Romagna, a portion of the premises had been used as a gravel site.
After the feasibility study, the so-called front parcel was acquired and an option secured on the rear parcel which rear parcel was owned by Locarno. The rear parcel under option had extensive boundary line problems with an abutting owner named Kowalski. CT Page 9422
The so-called front and rear parcels taken together contained several ponds which created planning and zoning problems.
The wetlands commission, after consideration and after various tests were done, determined that only one access would be allowed over Latimer Brook near Chesterfield Road on which the front parcel faced and because of this consideration was given to resolving boundary disputes with Kowalski over the rear parcel and in fact over Kowalski's land none of which parcels the partnership held title to at the time.
Any second bridging of Latimer Brook would have been financially prohibitive and would require a host of permits and approvals.
McDonald-Sharpe's final bill for the balance due was $128,402.86, with adjustments the amount claimed is $125,554.36.
In June 1986, when McDonald-Sharpe commenced the feasibility study, the front parcel was owned by Locarno and Romagna, Inc., and no contract or agreement was ever undertaken by the then owner with McDonald-Sharpe for any site work of any sort. No portion of the so-called Kowalski parcel was ever owned by Glen Lakes a/k/a.
The $400,000 mortgage to the bank covered the front parcel only. See Plaintiff's Exhibit 1, mortgage deed dated March 31, 1988. McDonald-Sharpe received from the partnership on various dates checks totalling $137,000 for its services.
The end result of all the subdivision efforts resulted in 17 approved lots.
Prior to McDonald-Sharpe getting involved in resolving boundary disputes with Kowalski, that work was in the hands of an engineer named Megson.
At the time of trial, the mechanic's lien of McDonald-Sharpe rested on the front parcel only, the lien as to the rear parcel having been released when Locarno foreclosed on the rear parcel. See Judgment of Strict Foreclosure, Docket No. 516807, Leuba, J., as to the rear parcel.
At the time the mortgage of $400,000 was taken with CT Page 9423 the bank, Angus McDonald never told the bank he intended to claim a mechanic's lien. Some of the proceeds of the mortgage loan went to McDonald-Sharpe to pay invoices at the time some of the funds were processed after the execution of the mortgage.
Angus McDonald, at the time of the second loan for $150,000 with the same bank, never disclosed any intention to file a lien. As of May 5, 1989, there were no monies due or owing to McDonald-Sharpe by the partnership.
Angus McDonald is a civil engineer, holds a master's degree and is a licensed surveyor in Connecticut. Mr. Brodeur was McDonald's accountant.
McDonald-Sharpe have been involved in as many as 500 subdivision projects along the Connecticut shoreline taking anywhere from two months to two years.
At the time of trial, even the 17 approved lots had not been staked out nor pinned.
McDonald-Sharpe ceased work on the subject premises on December 21, 1990. On various and divers occasions, Locarno visited Brodeur who was keeping the partnership records and complained of the slow pace of McDonald-Sharpe and indicated "we will all lose our shirts".
Mr. James B. Blair of 257 Main Street, Norwich, is a licensed and certified real estate appraiser in Connecticut who examined the premises subject of the foreclosure. The subject premises are assessed by the Town of East Lyme at $800,000. James Blair valued the subject premises at $210,000.
At the time of the foreclosure on the rear parcel by Locarno, the partnership Glen Lakes a/k/a owed Locarno $24,000. Locarno waived his rights to said sum when McDonald-Sharpe. released its mechanic's lien on the same. In addition, Locarno was given the right by the partnership to remove certain top soil from the front parcel.
The mortgage deed and note for $400,000 contain phraseology to the effect that the signatories will keep the premises free and clear of liens and encumbrances. On at least one occasion, McDonald was asked to sign a lien waiver by Attorney Marlowe and declined. CT Page 9424
The court makes the following findings of fact based on the exhibits.
Locarno and Romagna, Inc., a Connecticut corporation, conveyed a certain piece or parcel of land situated in the Town of East Lyme containing 97 acres more or less to Meadow Lakes Realty Co. by warranty deed dated December 15, 1986 and recorded December 17, 1986, for and in consideration of the sum of $600,000, East Lyme Land Records Vol. 228, pages 54-57. Said premises were conveyed together with rights of way and easements of record for ingress and egress to the Flanders-Chesterfield Road. See Plaintiff's Exhibit 6a. Said warranty deed was executed by Peter C. Locarno, Sr., duly authorized.
On March 31, 1988, Meadow Lakes Realty Co., a Connecticut general partnership, executed an open-end construction mortgage and security agreement in favor of New England Savings Bank in the amount of $400,000 and recorded March 31, 1988, East Lyme Land Records Vol. 260, pages 331-347.
This mortgage deed purports to cover a parcel of 97 acres of land more or less situated on Chesterfield Road in the Town of East Lyme. This mortgage deed was executed on behalf of Meadow Lakes Realty Co., by Peter C. Locarno, Sr., general partner, Donald S. Brodeur, general partner, Angus L. McDonald, general partner, Donald F. Snow, Jr., general partner, and Dennis H. Marlowe, general partner.
The accompanying commercial promissory note affixed to the mortgage deed was signed by all the above-noted general partners. See Plaintiff's Exhibit 16a and Plaintiff's Exhibit 1 and Exhibit 3.
In the chain of title concerning the premises conveyed by Locarno and Romagna to Meadow Lakes Realty Co., said corporation had acquired the subject premises and other land by virtue of a warranty deed. Peter C. Locarno, Sr. and Ellen J. Locarno to Locarno and Romagna, Inc., dated December 20, 1983 and recorded December 27, 1983, East Lyme Land Records Vol. 201, pages 487-491.
The partnership Meadow Lakes Realty Co. executed a Partnership Borrowing Resolution through all of its partners dated March 31, 1988, authorizing the partnership to borrow CT Page 9425 money and obtain credit from New England Savings Bank. See Plaintiff's Exhibit 7.
The mechanic's lien McDonald-Sharpe Associates, Inc. filed against Meadow Lakes Realty Co. claims $125,554.36, covers two parcels, refers to commencement of work on June 24, 1986, and is recorded in East Lyme Land Records Vol. 306 at page 542. See Plaintiff's Exhibit A and Plaintiff's Exhibit 14a.
The above consolidated foreclosures involve competing claims of priority on a single piece of property located in East Lyme, Connecticut. Docket No. 529244 is a foreclosure of a $400,000 mortgage recorded on March 31, 1988. Docket No. 520501 is a mechanic's lien foreclosure of a mechanic's lien recorded on October 10, 1990, in Vol. 306, page 542 of the Land Records of the Town of East Lyme.
The mechanic's lien represents a claim for services rendered on three distinct plots of land. Only one of the three plots is the subject of this action. That property is a 97-acre plot of land located on Chesterfield Road in East Lyme, Connecticut, which since, December 15, 1986, has been owned by Meadow Lakes Realty Company a/k/a Glen Lakes Realty. Meadow Lakes is a general partnership formed in 1986 for the purpose of owning and developing the land. Prior to the acquisition of the parcel by Meadow Lakes Realty Company, the property was part of a 224.24 acre parcel owned by Locarno and Romagna, Inc.
After the December 15, 1986 purchase of the front parcel by Meadow Lakes, Locarno and Romagna, Inc. continued to own the rear parcel, consisting of approximately 127.24 acres, until January 31, 1990, when Meadow Lakes purchased the rear parcel from Locarno. Subsequently, the rear parcel was the subject of a foreclosure action brought by Locarno on a purchase money mortgage from Meadow Lakes.
A third parcel of land, the Kowalski parcel, borders the rear parcel to the south and east. At all relevant times, it has been owned by Kowalski, and Meadow Lakes has had no interest in it.
McDonald Associates began work on the feasibility study on June 24, 1986, the date claimed in the mechanic's lien as the commencement of McDonald Associates' services with respect to the property. McDonald Associates continued work on CT Page 9426 the feasibility study until late 1986 at which time McDonald Associates concluded that the project was in fact feasible.
As a result, on December 15, 1986, Meadow Lakes took title to the front portion of the Locarno property consisting of approximately 97 acres.
The primary reason that the partnership purchased only the front parcel was because the rear parcel shared a border with a separate and distinct parcel whose boundaries were uncertain. This parcel was owned by Kowalski. The partnership did not wish to take title to the rear parcel until the boundaries with Kowalski and other issues regarding the Kowalski land were resolved.
McDonald Associates performed work on the front and rear parcels throughout 1987.
On March 31, 1988, the partnership took a mortgage loan from New England Savings Bank in the amount of $400,000. At the time that the mortgage was executed, McDonald Associates was owed no money in connection with its work on the project; that is to say it had been paid in full for all of its work up to that point in time. McDonald also had not begun any of the work that it ultimately performed on the Kowalski property and had not been directed or authorized to do so by the partnership.
The mortgage document itself, which Angus McDonald signed as a mortgagor, stated that ". . . grantor represents that grantor has (or upon acquisition will have), and will maintain title free from all prior liens and encumbrances . . . ."
In January of 1990, Meadow Lakes purchased the rear parcel from Locarno Construction and financed the purchase with a mortgage to Locarno Construction. Thereafter, McDonald Associates continued to perform work on both the front and the rear parcels until late 1990.
In June of 1990, when it was becoming increasingly clear that the financial picture of the partnership was bleak, Attorney Marlowe requested on behalf of New England Savings Bank that Angus McDonald sign a waiver of mechanic's lien form. Despite his agreement contained in the partnership borrowing resolution and in the mortgage document itself, Mr. McDonald failed to sign the document. CT Page 9427
In October of 1990, McDonald Associates filed its mechanic's lien in the amount of $125,554.36. On its face, the lien purports to be for materials furnished and services rendered "in the subdivision, site development and improvement of a certain parcel of land . . ." In actuality, however, the lien covered two distinct parcels of land, the front and rear parcels, and included metes and bounds descriptions of each. Despite the fact that much of the work claimed under the lien was performed on the Kowalski property, the Kowalski property was not liened. The amount of the lien represents the aggregate unpaid amount for work performed on the front parcel, the rear parcel and the Kowalski parcel. No attempt was made to allocate the work among the different parcels, and according to Mr. McDonald it would not now be possible to make such an allocation with reasonable accuracy.
The $125,554.36 claimed in the lien is in addition to
some $137,000 that McDonald Associates had already been paid for its work. Thus, McDonald Associates claims that the value of its work was over $260,000.
In September of 1991, McDonald Associates began its mechanic's lien foreclosure action seeking to foreclose its lien on the front parcel only, having already released the rear parcel.
McDonald Associates now seeks to foreclose the entire $125,000 mechanic's lien against only one of the three properties on which it performed work. The mechanic's lien statute by its terms provides in relevant part:
 If any person has a claim for more than $10 for materials furnished or services rendered . . . in the improvement of any lot or in the site development or subdivision of any plot of land, and the claim is by virtue of an agreement with or by consent of . . . the owner of the lot being improved or by consent of the owner of the plot of land being improved or subdivided . . . the lot or in the event that the materials were furnished or services were rendered in the site development or subdivision of any plot of land, then the plot of land, is subject CT Page 9428 to the payment of the claim.
Connecticut General Statutes § 49-33(a).
Section 49-34 provides the following procedural requirements.
 A mechanic's lien is not valid, unless the person performing the services or furnishing the materials, (1) within 90 days after he has ceased to do so, lodges with the town clerk of the town in which the building, lot or plot of land is situated a certificate in writing, which shall be recorded by the town clerk with deeds of land, (A) describing the premises, the amount claimed as a lien thereon, the name or names of the person against whom the lien is being filed and the date of the commencement of the performance of services or furnishing of materials . . . .
Connecticut General Statutes § 49-34.
The mechanic's lien is a "creature of statute, therefore a lienor must comply with statutory requirements."H S Torrington Associates v. Lutz Engineering Co., 185 Conn. 549,553 (1981); First Constitution Bank v. Harbor VillageLimited Partnership, 31 Conn. App. 15, 18 (1993). The burden of proof is on the lienor to establish the validity of his lien.Peck v. Brush, 89 Conn. 554 (1915).
The general purpose behind the mechanic's lien statutes is to "give to one who, by furnishing services or materials, under a contract with the owner of land, had added to its value by constructing a building upon it, or any appurtenances to a building, a substantial security for his proper remuneration." Balch v. Chaffee, 73 Conn. 318, 320
(1900). A mechanic's lien is not valid unless the written certificate of lien describes the premises and the amount claimed as a lien thereon. Connecticut General Statutes § 49-34(1)(A). "[T]he premises described must be the verypremises on which the work was performed. [The ConnecticutSupreme Court] has invalidated mechanic's liens where theproperty on which the lien was claimed was not fully chargeablewith the amount stated in the lien." Butch v. Mangomutha, (D.N. CT Page 9429 CV90-03759685S) (Super.Ct., 1993) (Aurigemma, J.), citingGinsberg v. Capone, 91 Conn. 169 (1916).
The principles that guide interpretation of the mechanic's lien legislation are well settled. While its remedial purpose to furnish security for a contractor's labor and materials requires a generous construction, Stone v.Rosenfield, 141 Conn. 188, 191 (1954); City Lumber Co. v.Borsuk, 131 Conn. 640, 645 (1945); Pierce, Butler Pierce Mfg.Corporation v. Enders, 118 Conn. 610, 615 (1934); Balch v.Chaffee, 73 Conn. 318, 320 (1900), generosity of spirit does not, however, permit departure from reasonable compliance with the specific provisions of the statute. Stone v. Rosenfield, supra; City Lumber Co. v. Borsuk, supra.
Until 1974, the mechanic's lien statute was deemed by the courts to require as a condition of lienability that work done be incorporated in or used in a building being constructed raised, removed or repaired. Camputaro v. Stuart HardwoodCorporation, 180 Conn. 545 (1980).
In 1974, the legislature authorized liens for materials furnished or services rendered in the "improvement of any lot" or the "site development or subdivision of any plot of land". Public Act 74-310. The courts have interpreted this amendment as permitting a lien for such materials or services regardless of whether they were incorporated into a building.Pomarico v. Gary Construction, Inc., 5 Conn. App. 106 (1985).
Prior to 1974, blanket liens generally were not allowed. That is to say, a developer could not lien an entire subdivision even if it were on a single plot of land. See In reGlen Haven Estates, 123 F. Sup. 659 (D. Conn. 1954). The 1974 amendment authorized such a blanket lien but only if the services were rendered to a subdivision contained within "a plot of land". See Public Act 74-310. Further, while a blanket lien attaching to an entire subdivision has been held valid,Pomarico, supra, where a lienor seeks to enforce the entireamount of a blanket lien against only a single lot within a subdivision, the Superior Court has ruled that the lien "must be limited to the value of the improvements on that lot." Butch v.Mangomutha, CV90-0375968S (Super.Ct., 1993) (Aurigemma, J.).
Mechanic's lien law in Connecticut has also long recognized that mechanic's liens are subject to the same rules CT Page 9430 of equity applicable to mortgages. Goodman v. White, 26 Conn. 317
(1857). Thus, the court may take into consideration the equities of this case when making its decision.
The subject mechanic's lien is invalid because it is claimed against only one of three parcels of land on which the work was performed. There is no dispute that McDonald Associates performed work on three distinct parcels of land: the front parcel, the rear parcel and the Kowalski parcel. This work was performed from June 24, 1986 to the date of the mechanic's lien in September of 1990. At no time during this period was there unity of ownership of the three parcels. The following chart summarizes the status of the ownership of the property at various times during the project.
 Front Parcel Rear Parcel Kowalski Parcel ------------ ----------- --------------- 6/24/86-12/14/86 Locarno Locarno Kowalski 12/15/86-1/31/90 Meadow Lakes Locarno Kowalski 1/31/90-7/22/91 Meadow Lakes Meadow Lakes Kowalski 7/22/91-present Meadow Lakes Locarno Kowalski
It is undisputed that the $125,554.36 claimed in the mechanic's lien represents work performed on the front parcel, the rear parcel, and the Kowalski parcel. The $125,554.36 does not represent work performed on the front parcel alone.
Connecticut General Statutes § 49-34(1)(A) states that a mechanic's lien is not valid unless the written certificate of lien describes the premises and the amount claimed as a lien thereon. The premises described must be "the very premises on which the work was performed". Butch v. Mangomutha, CV-90-0375968S (Super.Ct., 1993) (Aurigemma, J.). The certificate filed by McDonald Associates does not meet this criteria because it purports to lien the front parcel not only for services rendered to that parcel, but also for services rendered to the back parcel and the Kowalski parcel.
The statute gives a lien upon each building and lot for materials furnished in the construction of that building only, and the certificate must state the amount so furnished as nearly as the same can be ascertained. Larkin, 42 Conn. at 293. Therefore, where services are rendered on two or more adjoining plots, a valid lien cannot be placed upon a single plot encompassing the services rendered and materials furnished in CT Page 9431 the work completed on the various plots. Each plot must be liened separately.
McDonald Associates' mechanic's lien is invalid for the reason that it purports to cover services provided on multiple parcels, each owned by separate parties. Where the property worked upon is two or more separate parcels owned by separate parties, a single lien will not suffice. DeWolf v.Bonee, 91 Conn. 712 (1917).
In all of the cases in which blanket liens have been upheld, there has always been unity of title among the covered parcels. In the case at bar, there is no such unity of title.
Public Act 74-310 did nothing to change the rule which has emerged from the earlier cases. While it is true that the amendments did away with the requirement that services rendered be incorporated into a structure, it did not change the requirement that the lien on the parcel cover only materials furnished to that parcel. The very language of Public Act 74-310 leads to just such a conclusion. The Act provides for a lien for services rendered in the "site development or subdivision of any plot of land". Public Act 74-301. Thus, the intent was that a lien could now cover services rendered upon a "plot of land," not that a single lien could cover services rendered upon more than one plot of land, each owned by different parties.
The lien is not entitled to priority over the bank's mortgage because a large portion of the work represented by the mechanic's lien was for a separate and distinct contract formed after the date of the bank's mortgage.
The front parcel of the former Locarno property was acquired by Meadow Lakes in December of 1986 after a determination that the project was in fact feasible. McDonald Associates then began work on the actual subdivision of the property which it was envisioned would occur in sections.
In May of 1988, after the mortgage was recorded, McDonald was directed by the partnership to begin work on what was generically referred to as the "Kowalski problem". For the next year or so, the Kowalski problem was one of the principal activities engaged in by McDonald Associates. The Kowalski work was performed on Kowalski property, a parcel separate and CT Page 9432 distinct from the front parcel on which the mechanic's lien was lodged.
In Connecticut Bank and Trust Company, N.A. v. RaltoDevelopers, Inc., et al, D.N. 300841 (Super.Ct., 1992) (Fuller, J.), an engineer sought to foreclose for services rendered in connection with the development of a subdivision. The engineer had begun his work prior to the date of the mortgage and thus claimed priority of his mechanic's lien over the mortgage. Judge Fuller held, however, that the work performed by the engineer was not pursuant to a single continuous contract but was rather a series of contracts entered into as the work progressed.
McDonald Associates seeks priority for all the work performed under the various contracts entered into as the project progressed. They have not attempted to allocate the dollar value of the work performed among the various contracts.
A mechanic's lien may be satisfied by payment of the obligation out of which the right to the lien may be asserted. 53 Am.Jur.2d 851. Clearly, where payments are made, they are applied to extinguish the earliest items of labor and materials if there is nothing which shows the parties had a different intent. 53 Am.Jur.2d 856. Accordingly, Judge Fuller notes that, in the Balto case, "Even if [the] distinct claims for services could be tacked together, the right to make a continuing contract claim was defeated by the fact that all of the initial services . . . were fully paid . . . before the mechanic's lien was filed".
Clearly, a mechanic who has already been paid for services rendered or materials furnished is not allowed to file a lien on a property for those services or materials. Notions of equity suggest that the mechanic should not be able to collect twice for his services. In the case at bar, the rear parcel was also liened with a $125,000 lien, purporting to cover the same services and materials that the lien in question in this case covers. McDonald Associates, in accordance with an agreement made between it and Locarno, released its lien on the rear parcel in exchange for the following considerations: (1) Locarno waived his right to collect a $100,000 deficiency judgment against McDonald; and (2) Locarno released any claims to a $24,000 account receivable owed to it. Therefore, McDonald Associates has already received substantial, valuable CT Page 9433 consideration toward payment of the lien.
The lien does not have priority over the mortgage because McDonald participated in the negotiations for the mortgage and agreed by signing the mortgage to keep the property free from prior liens.
An action of foreclosure is an equitable action. CitySavings Bank v. Lawlor, 163 Conn. 149, 155 (1972), and as such, "the court may entertain all questions which are necessary to be determined in order that complete justice may be done between the parties". Hartford Fed. Savings Loan Assn. v. Tucker,196 Conn. 172-175 (1985).
Where, as here, a general partner is asserting a claim against the partnership for work performed by the partner in a different capacity, concerns are present that would not otherwise be the case.
In Oakhill Assoc. v. D'Amato, 228 Conn. 723 (1994), the court was confronted with a dispute arising out of a contract between Oakhill Associates, a partnership, and D'Amato Construction Company. Edward D'Amato was a general partner in Oakhill and the controlling shareholder of D'Amato Construction. Oakhill sued D'Amato alleging that D'Amato overcharged the partnership for site development work. At trial, the court ruled that Oakhill failed to meet its burden of proof on the issue. The Supreme Court reversed, recognizing that "generally, partners are `bound in a fiduciary relationship' and act as trustees towards each other and toward the partnership."Oakhill, at 727, quoting Konover Development Corp. v. Zeller,228 Conn. 206, 218 (1994).
Here, a general partner has acted out of his own self interest to the detriment of the partnership as a whole. Angus McDonald "wore two hats" throughout this project. He was a general partner in the Meadow Lakes Realty Partnership and he was the controlling shareholder and president of McDonald Associates. As a Meadow Lakes partner, he covenanted with the bank when the mortgage was obtained in March of 1988 to maintain title to the property free of prior liens or encumbrances. As a partner, he signed a partnership borrowing resolution indicating that materials would be signed as required by the bank to protect the mortgage. Despite a request to sign a waiver of mechanic's lien form he did not do so. Despite his covenant CT Page 9434 with the bank to keep the property free from prior liens, Mr. McDonald not only permitted such a lien to be filed, but as president of McDonald Associates, he caused just such a lien to be filed.
McDonald-Sharpe Associates claims that its mechanic's lien relates back to June 24, 1986. This cannot be the case because Meadow Lakes Realty Company a/k/a did not own any portion of the land until December 15, 1986, when Meadow Lakes purchased just the front parcel. Prior to that time, both the front and the rear parcels were owned by Locarno. Connecticut General Statutes § 49-33(a) provides that, for a lien to be valid, it must be for work done with "consent of the owner of the plot of land being improved". Locarno at no time consented to the work being done upon the properties. Under the mechanic's lien statutes, the consent necessary to establish a lien is a consent which is sufficient to establish an implied contract. Centerbrook, Architects and Planners v. LaurelNursing Services, Inc., et al, 224 Conn. 580, 591 (1993). It is clear that Locarno did not give such consent to the work being done upon the properties while he owned them.
McDonald-Sharpe Associates claims that the work it did was all part of a "single and continuous contract under which all the work was provided for the entire project". Initially, McDonald-Sharpe Associates was hired to do a feasibility study on the property for the purpose of determining whether subdivision of the property would be economically feasible. If McDonald-Sharpe Associates determined that subdivision of the property was not economically feasible, no further work would have been performed by McDonald-Sharpe Associates. Thus, in the beginning, McDonald-Sharpe Associates was hired for a quite limited and well-defined job. The considerable work done on the Kowalski problem could not have been part of this initial consideration, since at that time, another engineering firm had been employed to work on that problem.
The contract between Meadow Lakes a/k/a and McDonald-Sharpe Associates is in actuality a series of separate contracts, which in fact cover work done on different properties with different owners.
McDonald-Sharpe Associates has included in a single lien work done upon three independently owned properties. This clearly fails to meet the requirements of Connecticut General CT Page 9435 Statutes § 49-34. This infirmity is fatal to the lien. SeeDeWolf v. Bonee, 91 Conn. 712 (1917); Larken, et al v. Blackman,et al, 42 Conn. 292 (1875); Ginsberg v. Capone, 91 Conn. 169
(1916); Wilcox v. Woodruff, 61 Conn. 578 (1891).
Although McDonald-Sharpe Associates and Angus McDonald are admittedly separate entities, there are some aspects of common identity.
Angus McDonald owed his first loyalty to the partnership, and all of its interests were in a trustee relationship with his other partners, and their common interests were paramount.
Some of the decisions made by Angus McDonald as president of McDonald-Sharpe may well have adversely affected the interests of the partnership, particular reference being made to long inordinate delays in attending to partnership matters while McDonald-Sharpe was attending to the needs of other business clients.
For any partner to act in the dual capacity of partner and potential creditor is a perilous course and one not to be favored or encouraged.
The court has carefully weighed and considered the testimony of all the witnesses, their bias or prejudice, if any, candor or lack thereof and self interest.
The lien is invalid for the reasons stated and is ordered discharged.
The court finds that the $400,000 open end construction mortgage and security agreement from Meadow Lakes Realty Company to New England Savings Bank dated and recorded March 31, 1988, East Lyme Land Records Vol. 260 at pages 331-347 is a valid first mortgage on the subject premises subject only to taxes to the Town of East Lyme.
The court directs further proceedings to determine the total amounts due the bank, the setting of law days, counsel fees, title search fee and appraisal fees, particularly being mindful of the additional sums owed on the $150,000 mortgage.
Austin, J. CT Page 9436